Good morning. My name is Susan Silvera. I'm with the Law Offices of David Boone. We represent the debtor appellant Christian Mendoza. I'd like to make a few comments, Your Honors, and then reserve the rest of my time for rebuttal. The first point we'd like to make is that the Court in this matter wrongly concluded that the debtor's condition would improve if he took medication. This is a speculative assumption not based on any evidence in the record. In fact Didn't the doctor testify that being on regular medications would have had an impact on the doctor's opinion of his disability? No, that wasn't the doctor's testimony, Your Honor. The doctor's testimony was that forgetting medication was symptomatic of the debtor's deteriorating condition. Wait a minute. That's not inconsistent with it. That doesn't really directly answer what Judge Tolman's question. The question is, one, would it have – would his condition improve if he regularly took medication? Your answer is there's a reason that he didn't regularly take medication, because of his mental condition. Well, there was The first question is, you know, whether he can regularly take medication, whether he's able to do that, given his condition, is a separate question from whether if he did, his condition, he would be able to function. Well, I think the important thing for the Court to recognize is that the trial court made a speculative assumption. There was no evidence in the record to show that the evidence in the record That may be the important thing for the Court to recognize, but it's not the question Judge Tolman asked you. And before you tell the Court what's important for it to understand, you would be better advised to answer the question. Well, first of all, the evidence in the record is that the debtor was taking Ritalin as a way of dealing with some of his symptoms. It would not control all of his symptoms. And that's the debtor's testimony in the record. With respect to the doctor's testimony, he did not state that Ritalin was the panacea. It was not the cure. It was not going to put Mr. Mendoza in a position of being able to be fully employed and make an income three times of what he was earning at the time. There's nothing in the record to support that, Your Honors. We know when he was working in real estate, whether or not at that point in his life he was on regular medications. His testimony, the debtor's testimony was when he was making a living at real estate, an actual living at real estate, prior to entering the University of Santa Clara and in medical school. He was doing what he said well. But subsequent to that, Your Honors, he had another brain injury, another car accident which caused another brain injury. The Court needs to remember this man had serious three-head traumas. He was seriously brain damaged. The ADD was simply a result of this, not the full impact of his disability. And there was no evidence to support that simply taking or not taking Ritalin would make a difference. Now, what the record did show was that the fact that he seemed to be forgetting his medication, and the doctor's testimony was that when he did meet with the debtor on several occasions, he had tested to see, he asked him questions to see if he had been on his medication and was satisfied that he was in those interviews. But at one point, he became concerned that the debtor was perhaps forgetting his medication, and he said this was symptomatic of the fact that his condition was deteriorating. Alitoson, wasn't there also a problem with the fact that the doctor can only prescribe 30 days' worth of medicine at a time, and that more than 30 days had elapsed between visits to the doctor? Well, but again, the Court – if the Court reviews the record, the doctor took steps to determine whether or not he had been on the medication. And what isn't in the record is evidence that any other doctor was prescribing those particular antipsychotics where it was. Well, actually, that's not true, Your Honor. The record shows that Mr. Mendoza had seen other doctors. And by Dr. Fisher's testimony, was perhaps confused in his testimony as to – Wait a second, counsel. That's not my question. My question is what proof was there in the record that he was actually receiving medication from other doctors? I thought that the treating physician testified that it's possible that one of the reasons that he wasn't regularly taking medication was that he could only give them 30 days' supply at a time, and he wasn't seeing him every 30 days. That's correct, Your Honor. But as the Court may take judicial notice of the fact that one doesn't need to see a doctor to renew a prescription. And the debtor testified that he was aware – But I'm aware to do that. Well, one can call – you go to the pharmacy, the pharmacy calls it in, it's renewed. But he also testifies – if you look at the record, Your Honor, he testified – Hold on. Slow down. I just want to – Make it easy. Before your time is running out, and I just kind of want – I have one question. At the time the district court – the time the bankruptcy court decided this case, it was April 24, 2003, correct? Nye's hadn't been decided by that time. That's correct, Your Honor. Does Nye's in any way change the landscape here? Well, I think Nye's simply enunciated a lot of the factors that other bankruptcy courts had used in applying the second prong of the test, which I think – which we think Mr. Mendoza meets. Well, let me ask you this. In other words, if Nye's had – if the district – if Is it reasonably probable that there's some aspect or parts of Nye's or some principles in Nye's that would have been beneficial to your client? I mean, would it change – possibly change the outcome here? Well, certainly. For example, if the court is hanging its hat on the fact that if Mr. Mendoza could take more medication and thereby improve his employability and triple his earning capacity, how could he afford this? He had no health insurance. His expenses were going to increase, and in Nye's it says you take into account the fact that, well, yes, there may be increased income, but that has to be weighed against increased expenses. And the record is clear. Setting aside this issue of the medication, the record is clear that this fellow – this debtor had a severe disability based on brain injury. His condition was deteriorating. He was 51 years old, which is another factor that Nye's takes into account. But also in payment, Your Honor, the court there – Let me phrase the question a little bit differently. Would you have approached this case any differently if Nye's had been on the books at the time of your hearing before the bankruptcy judge? Well, not having been the trial attorney, Your Honor, it certainly would have been helpful to have rehabilitated Dr. Fisher's testimony, because I think a lot of questions were left hanging that could have easily been resolved on the record. I think Dr. Fisher was clear in the fact that even if he knew Mr. Mendoza was earning an income at real estate, that income was nil. He testified that he had patients who were real estate brokers and thought they were working, but their earning capacity was nil. And this clearly fit Mr. Mendoza's circumstances. We might have been more clear on the fact that the expenses he was looking towards in terms of his treatment and structured living environment and such that Dr. Fisher felt would be necessary for him, that that would certainly impact any extra income he may expect. This debtor was living at poverty-level existence, working the hardest he could at this real estate broker business, and he had tried other jobs, and he had not been successful at those jobs. We would have pointed out that he had no assets. I mean, these are all factors laid out in NICE. But also in Pena, the court noted that the debtor did not have the benefit of the student loan-funded education, which is absolutely true here as well. Mr. Mendoza was never able to finish medical school, not for any lack of effort on his part. He tried very hard to get through medical school. And in fact, when he took his test, his MCAT test, to progress in medical school, he took it under ideal circumstances with his medication, and he still could not pass that test. He wanted to. He tried desperately to, and he still could not do that. His ability to function at that kind of level was impaired by his disability, which certainly meets the additional circumstances prong. And we think that there was not only clear error in terms of the fact-finding, but there was also an error of law in terms of misapplying the preponderance of evidence standard at the trial court level, but also misapplying the additional circumstances test. The trial court found that the debtor's condition was not hopeless. That is not the standard. The standard is, does he meet these factors by preponderance of the evidence? And clearly, this debtor met many of these factors. And finally, Your Honor, the debtors with less dire and severe circumstances than Mr. Mendoza's were found to have ---- Kagan in on its own facts. A lot of the cases you cite are trial-level bankruptcy cases. Correct. But the key for me was whether NISE makes it ñ might make a difference here, and whether or not the bankruptcy court ought to reevaluate this case in light of NISE. Well, I think so, in that NISE lays out many, many factors that the debtor here meets. And these are all factors that these lower bankruptcy courts had considered in their rulings. And I think that's what NISE was about. Thank you, Your Honors. Do you have any questions? Thank you. May it please the Court. Miriam Heiser. I'm appearing on behalf of both Appellees Educational Credit Management Corporation and Hemar Insurance Corporation of America. I'd like to start by responding to some of the questions that the panel addressed to Appellant's counsel. It is simply incorrect that the doctor took any time he saw him. As a matter of fact, the very first time that the doctor saw Mr. Mendoza, he has testified that he had no records to ñ from which he could ascertain that the last time ñ either the last time the debtor was seen by any doctor or any doctor that had given him medications in the last month. It is also not correct that any other doctor prescribed Ritalin to the ñ to Mr. Mendoza. The only other doctor that Mr. Mendoza said that had prescribed any medication at all was a Dr. Contreras, and he admitted in his cross-examination that Dr. Contreras did not prescribe the Ritalin. It is ñ there's no evidence ñ Your Honors had asked about whether there was any evidence he was on Ritalin when he was working as a real estate broker, and there's no evidence one way or the other in the trial court record. Mr. Mendoza had said that he was improved when he was on Ritalin. The problem that the plaintiffs had when they took this case to trial was that they were trying at one time to advance two very separate theories of the case. One was that Mr. Mendoza was working, he was going to the office every day, he was actually earning income, albeit a small one, but he also admitted he'd never looked for any work other than as a real estate broker in the last four to five years. At the same time they were advancing this theory, they advanced the theory that Mr. ñ Well, he'd been in several professions, it would seem. I mean, he didn't do too well on his ventures in medical school. Then he became a forklift driver, and that was a disaster. He didn't last very long at that, and he ñ whatever it did, it crashed, he ruined the computers. Then he became a real estate broker where he struggled along. What professions did you want him to go into? Your Honor, this is a man who has a Bachelor of Science from Santa Cruz University who had a scholarship to Harvard, who had a scholarship to the University of Hawaii, and was working on AIDS research, who got into medical school, which by itself has ñ is an indication of some income. Absolutely, he could probably not work as a doctor, but that is not the legal standard. And with ñ For the brain injury, wasn't it? I'm sorry, Your Honor. For the brain injury? Well, Your Honor, there's actually no evidence in the record that there is a brain injury. The only reference is in one of the exhibits that was admitted, not for the truth of the matter asserted, but the ñ if you ñ the trial court did not accept the fact that Mr. Mendoza had a disability that kept him from working. And the expert or witness opinion to that effect was ñ is only as good as the facts on which it was based. And on cross-examination, the facts upon which it was based would be wrong. He was basing Dr. ñ the gentleman who said that he was permanently disabled, the expert witness, was under the assumption that he wasn't working. And when he was informed that, in fact, Mr. Mendoza was, in fact, working when he first diagnosed him as disabled, and not just working, but earning money, he said, yeah, that would change his opinion. So what ñ there's really no evidence that ñ the trial court disbelieved the testimony that he had any sort of disability that kept him from working. And with respect, just to follow up a little bit further on Your Honor's question. I recall when he said he would change his opinion, it was as if he was really earning a living, not just if he could make a little bit of money. Actually, Your Honor, what he said was if he was, in fact, earning money. He did not say whether he had to have been earning a ñ you know, a more than a minimal standard of living. The question was if he was ñ If you take out the single sentence, you might conclude that. But if you read the whole paragraph, I think you would see that he was saying, if this is somebody who can really earn a decent living, then I would say that he doesn't have a permanent impairment. But he didn't say if he can make a little bit here and a little bit there, that would change my opinion. Well, Your Honor, I would respectfully disagree, because the first question was, if you understood he was working as a real estate broker, would that change your opinion? And that's when he says, no, if he was just working, because a lot of people go to the office, but they can't actually make any money. And then I ask the follow-up question, well, if he, in fact, was earning money, would that change your opinion? And at that point, he says, yes, that would change my opinion. He didn't say how it would change his opinion. No, it didn't. He did not. He did not. If he was going to the office every day but not earning any money, then it wouldn't change his opinion. But if he earned $5 in a year, it would change his opinion. Is that how you interpret the testimony? What I interpret the testimony is, Your Honor, is that he had the – his understanding, his opinion was based on the fact that this guy was not working and earning any money. But he said if he were going to the office regularly, that would change his – that wouldn't change his opinion. It's only if he were making $1 or $2 or $5. If he was, in fact – the question was – I don't know whether he was making enough money to have a regular living or a living at all, as long as he was making any amount of money. If he was making money is the answer, Your Honor. It was not – it was not asked any more specifically than that. Yes. So in your interpretation, that means if he made $2 in a year, that would be it. No, Your Honor, my interpretation is based on the fact that the record had reflected he was, in fact, making $1,500 or $1,600 a year. I'm not saying that because he didn't know that. It was your question. The way you read the – you told – I said I think you're taking the sentence out of context. And you said, no, the sentence means he was asked if he was making money, so it doesn't mean he has to be making a decent amount. It just means he has to make something, is what you said. And I asked you then, does that mean if he made $5 a year? And then I didn't get an answer. Well, Your Honor, if he was making $5 a year, I don't think that really qualifies as earning a living. Making money. I don't think that's making money. What is making money? Well, making money is – I guess there's not a dollar figure that would be relevant, but the relevant question for this Court is whether or not he actually had a disability that kept him from earning money. Okay. All right. Well, we've exhausted that question. But, Your Honor, I guess I would propose even if there was no cross-examination of the doctor and even if the concessions had not been made by him, the trial court had plenty of evidence to support their findings of fact, that Mr. Mendoza was not working very hard with respect to his work efforts. Your Honor had posited the question of didn't he try to work as a truck driver. Yes. He had a three-week stint as a truck driver. He – For a forklift. I'm sorry. Forklift driver. I'm not this guy driving. No, we probably don't. But as a forklift driver. But he himself testified the reason he had the problem was he was trying to do two jobs at one time. And the – And this guy doesn't try hard enough to work? He was doing two jobs at one time? Well, Your Honor, he – his respect – with respect to the trial court's finding as to whether or not he was working very hard, the specific finding was that at various times he wasn't. Because he testified in 1999 and in 2000, he was basically thinking about other ways to earn money. He was doing a lot of oil painting. He'd actually, in fact, won a scholarship to the University of Hawaii. I'm sorry. He won a scholarship to Santa Cruz for his oil painting. He himself professed to be a pretty decent oil painter, but he hadn't pursued that or any other career. And the only way that the debtor can overturn the trial court's findings of fact is if it is clear error. And there's more than sufficient evidence in the record to support each of the testified. Each one of them is lifted directly from the testimony of either the plaintiff or the plaintiff's expert. I would like to respond very briefly to Your Honor's questions about the Nye's case. As Mr. Zahn will be arguing in the next case, we believe that that Nye's BAP opinion is a vast departure from this Court's Pena and Rufino test. But I would submit that even if this Court were to accept the Nye's BAP opinion, that Mr. Mendoza does not meet the standard under that. First of all, he's not raised the issue of whether or not the Court applied the appropriate legal standard. But second of all, if you flip through the Nye's criteria, he does not meet the standard. I think at one point in the blue brief, there is a suggestion that the case ought to remand in light of Nye's. I'm sorry, Your Honor, I didn't hear you. In the blue brief, I believe there's a suggestion that the Court ought to remand in light of Nye's. The only argument he makes, Your Honor, is that the bankruptcy court conclusions were based on an erroneous view of the law because there was no evidence to support them. That's – I mean, it does seem that he's listed that issue as one of his 12. I recall there being a reference to the Nye's BAP opinion. There is a reference to the Nye's BAP opinion, but he's really – if you look at the brief, all he's arguing is that the trial court committed clear error. He's saying – You know, I know that we're going to address Nye's directly in a few moments, but – Okay. Well, I would like to submit – Look at Nye's and the facts in Nye's, and it's – you know, she's earning, what was it, $2,000 a month, has a home, $40,000 in equity in the home, 52 years old at the time, I believe it was. Your Honor, this is also a debtor – I'm sorry, go ahead. She had made some payments on the debt, and yet the bankruptcy court there, or the BAP court, you know, she had met her burden. That's correct, Your Honor. I'm indicating that I have out of time. I had another minute or two. Do I – I don't know. We'll give you one more minute. Okay. Just very briefly, the Court should keep in mind that this Mr. Mendoza is a person who had a successful real estate business. He financed his schooling through his student loans. He also substantially supplemented his income with his credit cards. And he was not someone who was – at various points he was having difficulty with his standard of living. But it is not the case that he was living really at a poverty level. I don't think there's that much of a distinction between his facts and the facts of the Nye's case. They're both educated people who are – who had successful businesses. Mr. Mendoza owned his own home at one point. He testified to that. That's all I have, Your Honor. At one point he was homeless. For – yes, Your Honor, at one point he was. By way of rebuttal, Your Honor, I wanted to call the Court's attention to some parts of the record that perhaps amplify my response to some of the Court's questions earlier. On page 37 of the trial transcript, or actually 51 on our excerpt of record, this is excerpt record three, the debtor testifies, right, that I have for, like I say, with the methylphenidate, the triplicate drug, I have to go every month and get the prescription refilled because it's a controlled substance. And then I don't have any health insurance at all. And he goes on to talk about the expense of that. But then he testifies, the question is, so when you say you have to have the medicine renewed, does that mean you have to pay for a doctor visit to get another prescription? Yes. And he does that each month at the expense of $60. That's on the record, Your Honor. And additionally ---- Is there evidence on the record about whether this ADD affects either his ability to take the drugs regularly or to go to the doctor monthly? Well, yes, that's in Dr. Fisher's testimony further on. For example, on page 72 of the trial transcript, this is Dr. Fisher's direct testimony. The question was, okay, did you prescribe medications at that time? And Fisher responds, yes, at that time he had also seen some other doctors and was taking metadate 20 milligrams three times a day. So there is evidence that he was getting prescriptions from other doctors. And finally, perhaps more in response to the Court's query, on page 78 of the trial transcript, Dr. Fisher's direct testimony again, it's asked, is it your opinion that the symptoms you observed were deterioration in Mr. Mendoza's condition, deterioration in his health rather than the fact that he wasn't taking his medication? You explored that, and did you come to some conclusion? And Fisher said, I felt that the one time I had seen him, the last time I had seen him, I felt that he may have missed his medication because he usually, when I would check with him before, there was evidence that he was taking his medication. I think he was forgetting so much, and that's not uncommon. Many times you find that with patients with severe ADD, that in some stages of deterioration, they actually forget to eat, they forget to take their medication, and someone has to structure that for them. And he goes on to testify that he believes Mr. Mendoza fits in that category. He's in the top 5% of his most severe patients. Also with respect to NISE, we think it's useful in our case for the simple fact that, again, ECMC points out that all we can show or all we can argue is that the court committed clear error, and that's a very high standard. But in NISE, it also points out that misapplying the legal standard as they did was an error of law, which is reviewed de novo by this Court and which we think is essential for this Court to take into consideration in terms of our appeal and our request for remand and reversal. Thank you, Your Honor. Thank you both. The case is here. It will be submitted.
judges: Reinhardt, Paez, Tallman